

US BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS



**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

_____

**Signed August 18, 2009**                                    **United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE | § | CHAPTER 7 |
| | § | |
| GARTH M. BEVERIDGE AND | § | |
| DINAH LEE BEVERIDGE, | § | CASE NO. 08-40647 (DML) |
| | § | |
| DEBTORS. | § | |

| | | |
|---|---|---|
| | § | |
| INTERNATIONAL BEAUTY PRODUCTS, LLC, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | ADV. NO. 08-04096 |
| | § | (CONSOLIDATED WITH |
| GARTH M. BEVERIDGE, | § | ADV NO. 08-04114) |
| DINAH LEE BEVERIDGE AND | § | |
| CAREY D. EBERT, CHAPTER 7 TRUSTEE, | § | |
| | § | |
| DEFENDANTS. | § | |

**Memorandum Opinion**

The above-styled adversary proceedings (the "Adversaries")[1] were tried by the

court beginning January 28, 2009 and continuing from time to time for ten days, finally

ending on April 8, 2009.[2] At trial the court heard testimony from plaintiff International

Beauty Products, LLC's ("IBP") principal James Perry ("J. Perry"); and defendants Garth

Beveridge ("Mr. Beveridge") and Dinah Beveridge ("Mrs. Beveridge" and, with Mr.

Beveridge, the "Beveridges"). The court also heard testimony from Sheree Hughes

("Hughes"), an accounting manager at Hay-Tec[3] and later at Jerome Russell;[4] Tiffany

Williams, an accounting employee at IBP; Rick Soto, a computer contractor who worked

on Jerome Russell's computers; Robert Perry ("R. Perry"), J. Perry's brother and a

consultant to IBP; Melinda Harper ("Harper"), IBP's forensic accountancy expert

witness; and Gary Rice ("Rice"), a sales representative who also worked on contract for

Jerome Russell with the title of Vice President of Sales. The parties  also designated the

depositions of Catherine Gonzales ("Gonzales"), the Controller of Jerome Russell during

part of the relevant time period; Florentine Judge, an employee of Jerome Russell at the

time the Beveridges' employment was terminated; Bernard Metivier, a warehouse

employee of Jerome Russell; Raymond Saitta ("Saitta"), a certified public accountant

who supervised outside audits of IBP during the relevant period; Kristina Connor, a

certified public accountant and expert witness for IBP; David Penrod, a computer expert

---

[1]     The Adversaries were consolidated on motion of IBP by court order of July 8, 2008.

[2]     Due to scheduling problems the trial was fragmented, and took place on January 28, 29, and 30,
March 2, 3, 4, and 20, and April 6, 7, and 8, 2009. The record in the Adversaries was completed
on June 3, 2009, when the court was provided with the last of the depositions designated by the
parties.

[3]     Hay-Tec International, Inc. (regardless of who owns the company or its incorporation status,
"Hay-Tec") was originally incorporated, but IBP operated Hay-Tec as an unincorporated division.

[4]     Jerome Russell Cosmetics USA, Inc. (regardless of who owns the company or its incorporation
status, "Jerome Russell") was originally incorporated, but IBP operated Jerome Russell as an
unincorporated division.

retained by IBP; Diana Lee Tary, an employee of Jerome Russell and, at relevant times, Mr. Beveridge's secretary; Harvey Manne, Jerome Russell's warehouse manager; Ian Fishman, an employee of 220 Laboratories, Inc. ("220 Labs"); Elizabeth Johnson-LaRochelle, Customer Service Manager for IBP; Barbara Luna, the Beveridges' forensic accountancy expert witness; Richard Gralnik, the Beveridges' computer expert; Sandra Sandoval, a warehouse employee at Jerome Russell; Vivian Stoffer, a Jerome Russell employee who oversaw compensation of commissioned sales representatives; and Sheila Olson, an employee of IBP. The parties offered into evidence numerous exhibits, referred to below as necessary.

The court exercises core jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157(b)(2)(I) and (O). This memorandum opinion embodies the court's findings of fact and conclusions of law. FED. R. BANKR. P. 7052.

## I. Background

### A. The History of Jerome Russell and the Beveridges' Employment History

Mr. Beveridge began working for Jerome Russell[5] at its formation in 1984. At some point, after the Beveridges married in 1988,[6] Mrs. Beveridge, who had prior experience in the beauty industry, began working for Jerome Russell on an unpaid basis, assisting Mr. Beveridge at trade shows. Subsequently, her employment by the company was formalized.

---

[5]     Jerome Russell was a beauty products company that specialized in hair styling products such as temporary colors and gels. Jerome Russell's products were targeted directly at consumers and were sold through beauty and drug stores.

[6]     The Beveridges soon divorced, but reconciled shortly afterwards and remained together through trial of the Adversaries, having remarried in 2005. At all pertinent times the Beveridges regarded themselves as husband and wife.

Jerome Russell was initially owned by David Marcus ("Marcus") who sold it to Pro-Style Acquisition Corporation ("Pro-Style") in early 1998.[7] Pro-Style and its subsidiary, Jerome Russell, were controlled by Kenneth Bernstein ("Bernstein"). Bernstein financed Pro-Style's purchase of Jerome Russell through a $6 million loan from Finova Mezzanine Capital, Inc. ("Finova") secured by all of the assets of Pro-Style and Jerome Russell, and a $1.5 million equity investment by ProFutures Bridge Capital Fund, L.P. ("ProFutures").[8]

After closing on the purchase of Jerome Russell in 1998, Bernstein continued the employment of Mr. Beveridge, naming him President and CEO of Jerome Russell. Mr. Beveridge and Pro-Style, through Bernstein, entered into an employment agreement which described Mr. Beveridge's compensation and benefits package (Defendant's Exhibit A; hereafter IBP's exhibits will be designated by "PX" and the identifying number, while the Beveridges' exhibits will be designated as "DX" and the identifying letter).[9] In addition to serving as President and CEO of Jerome Russell, Mr. Beveridge was elected as a director of Pro-Style. Bernstein also retained Mrs. Beveridge in a full-

---

[7]     Mr. Beveridge testified that Marcus had promised him a share of the proceeds of sale but did not keep that promise.

[8]     ProFutures is an investment fund which has specialized in investing in small companies. ProFutures has two general partners, Bridge Capital Fund, Inc. ("Bridge") and ProFutures Fund Management, Inc. ProFutures also has approximately 85 limited partners that are largely individuals, families, or family trusts. J. Perry is the president and 100% shareholder of Bridge. Through Bridge he is responsible for specific investments by ProFutures, including selecting companies for investment, monitoring investments, and exiting investments.

[9]     Mr. Beveridge's employment agreement provided for a salary of $150,000 per year for the first two years (1998-1999), $175,000 for the third year (2000), $200,000 for the fourth year (2001), and $250,000 per year for the fifth year (2002) and every year thereafter. The employment agreement further granted Mr. Beveridge stock options to purchase up to 55,000 shares of Pro-Style at 40¢ per share. Mr. Beveridge's employment agreement also provided for a car allowance. Finally, his employment agreement granted Mr. Beveridge two life insurance policies, as to one of which he was allowed to designate the beneficiary; the other provided that the company would designate the beneficiary until such time as the employment agreement was terminated, at which point Mr. Beveridge would have the right to designate the beneficiary.

time paid position as Show and Promotions Manager and assigned her the task of
working trade shows.

In 1999, Pro-Style acquired Hayashi for Hair, Inc. ("Hayashi")[10] and Technica[11]
through Pro-Style's wholly-owned subsidary, Hay-Tec. Pro-Style's acquisition of
Hayashi and Technica was financed through a $2.5 million loan from Key Bank, N.A.
("Key Bank"), which was secured by all of the assets of Pro-Style, Jerome Russell, and
Hay-Tec. In connection with the transaction, Finova subordinated its liens to Key Bank's.

In 1999 Pro-Style, including both Jerome Russell and Hay-Tec (which included
both Hayashi and Technica), had annual sales of approximately $18 million and cleared a
profit. Over the next year, however, Pro-Style began to encounter financial difficulties
due partly to reduced sales and partly to yet another purchase, this time of Jerome
Russell's British sister company which marketed comparable beauty products in Europe.
As Pro-Style's sales began to decline, Bernstein blamed Mr. Beveridge for Pro-Style's
financial problems, and, in 2000, Bernstein unilaterally terminated Mr. Beveridge's
employment agreement, demoted him to the position of Vice-President of Operations for
Jerome Russell, took some of his responsibilities away, and reduced his salary to
$110,000 per year.[12]

After being informed of his demotion, Mr. Beveridge discussed his options with
his lawyer, Stuart Neuville. Nevertheless, ultimately Mr. Beveridge acquiesced in the

---

[10]    Hayashi specialized in products targeted towards hair care professionals. Its products were sold
directly to salons through Hayashi's distribution network.

[11]    Technica was a company that sold beauty tools such as blow dryers and scissors.  The court can
find nothing in the record that reflects Technica's form of organization.

[12]    Bernstein gave Mr. Beveridge an opportunity to attain his former salary and position by meeting
certain financial targets. Mr. Beveridge never met those targets, and described them in his
testimony as impossible to meet.

demotion and the reduction of his salary and responsibilities. At some point, Bernstein reinstated Mr. Beveridge as president of Jerome Russell and added Hay-Tec to his management responsibilities; however, Bernstein did not change Mr. Beveridge's salary.

Pro-Style's financial situation continued to worsen. By 2001, the company's aggregate sales had fallen to $8 million and Pro-Style had defaulted on the Finova and Key Bank loans. Pro-Style attempted a workout of the loans but was unsuccessful.

In order to save his own investment Bernstein initiated negotiations to purchase Key Bank's loan and senior liens, presumably intending to foreclose on Pro-Style's assets and eliminate the interests of Pro-Style's junior lender and equity investors. Bernstein was unable to negotiate the purchase of Key Bank's loan, and Key Bank approached J. Perry and informed him of Bernstein's efforts to acquire the Key Bank position.

On May 9, 2002, ProFutures itself purchased Key Bank's loan (PX8) and senior liens through a single-purpose entity, Style Holdings, LLC. Next, J. Perry began negotiations with Bernstein about taking over Pro-Style's business and assets.[13]

While ProFutures and Pro-Style were still in the midst of negotiations, Finova initiated foreclosure proceedings with respect to Pro-Style's assets. The foreclosure sale was originally scheduled for August 13, 2002, but was rescheduled several times as the parties negotiated, until it was finally set for August 22, 2002.

On August 13, 2002, Bernstein filed Chapter 11 bankruptcy petitions for Pro-Style, Jerome Russell and Hay-Tec in the United States Bankruptcy Court for the Central

---

[13]    While the negotiations were primarily handled by ProFutures's and Pro-Style's lawyers, Mr. Beveridge was aware of the process and participated in the negotiations *via* email and at least one conference call. The negotiations were hostile and Bernstein instructed Mr. Beveridge not to communicate with J. Perry. The evidence suggests, however, that, despite Bernstein's instructions, J. Perry and Mr. Beveridge had at least some one-on-one communications.

District of California. The next day, after further negotiations with ProFutures, Bernstein

caused the bankruptcy petitions to be dismissed.[14] Finally, on August 16, 2002, Bernstein

reached agreement with ProFutures, that ProFutures would pay Bernstein $425,000 and

release Bernstein and his wife from their personal guaranties of the Key Bank loan in

exchange for Pro-Style surrendering its assets.[15]

 As well as negotiating an agreement with Bernstein, ProFutures approached

Finova in order to purchase Finova's loan and liens. Upon success of both negotiations,

ProFutures then formed IBP[16] and purchased Finova's loan through IBP.

 The August 22, 2002, foreclosure sale proceeded as scheduled and IBP, standing

in Finova's shoes, bid in all of Pro-Style's assets, including those of Jerome Russell and

Hay-Tec.[17] Thereafter, IBP proceeded to operate Jerome Russell and Hay-Tec as

unincorporated divisions.[18]

 After purchasing Pro-Style's assets, J. Perry traveled to Los Angeles and met with

Mr. Beveridge. During that meeting Mr. Beveridge represented to J. Perry that he was

being compensated at a salary of $110,000 per year and Mrs. Beveridge was being

---

[14] It appears from the evidence that Bernstein asserted that the bankruptcy cases were filed in error. The record does not reflect compliance by the debtors with FED. R. BANKR. P. 1017(a).

[15] Though the terms of the parties' agreement were to be kept confidential at Bernstein's insistence, the court, considering IBP's statements that Bernstein refused to comply with subpoenas issued in litigation related to the Adversaries, directed, over IBP's objection, that the terms not be sealed from the public.

[16] IBP was organized in Colorado and is managed by IBP Management, Inc. ("IBPM"), of which J. Perry is  president.

[17] By purchasing Pro-Style's assets through a UCC Article 9 foreclosure sale IBP was able to avoid assuming any of Pro-Style's liabilities, including those of either Jerome Russell or Hay-Tec. According to R. Perry and J. Perry's testimony, however, IBP paid at least the trade debts of Pro-Style attributable to Jerome Russell and Hay-Tec.

[18] The record does not reflect the fate of the corporate shells of Jerome Russell and Hay-Tec.

compensated at a salary of $60,000 per year. J. Perry offered Mr. Beveridge the job of

president and CEO of IBP's Jerome Russell and Hay-Tec divisions,[19] continuing his

salary of $110,000 per year. J. Perry testified he also intended that Mr. Beveridge would

continue to receive benefits afforded to other employees by Pro-Style.[20] J. Perry also

agreed that Mrs. Beveridge would continue with Jerome Russell at her salary of $60,000

per year.

### B. Lucknow History and Payments

Lucknow Worldwide Ltd. ("Lucknow") is a British Virgin Islands corporation

(PX3). Mr. Beveridge purchased Lucknow in 2001 through Beauson Enterprises Ltd.

("Beauson"), a Hong Kong company. Lucknow was based at Beauson's office in Hong

Kong and had a Hong Kong based nominee director provided through Beauson.[21] At trial

Mr. Beveridge testified that Lucknow maintained multiple bank accounts in Hong

Kong.[22] Mr. Beveridge claims he purchased Lucknow as a vehicle for his personal

investments; however, he never made any investments through Lucknow.

On August 6, 2002, on the eve of IBP's takeover and while participating in the

negotiations between Bernstein and ProFutures, Mr. Beveridge directed Gonzales to wire

---

[19]    While J. Perry offered Mr. Beveridge the position of CEO of the Jerome Russell and Hay-Tec
divisions, J. Perry did not make Mr. Beveridge an officer or director of the parent company, IBP,
or of IBPM.

[20]    J. Perry subsequently entered into a transaction with the investors who were wiped out by the
foreclosure sale. Mr. Beveridge participated in the transaction by reason of his warrants and thus
wound up with an indirect ownership interest in IBP.

[21]    Mr. Beveridge named Ng Oi Che ("Che") as a nominee director of Lucknow. Che was an
employee of Beauson. Mr. Beveridge agreed to indemnify Che as a condition of naming him as a
nominee director. *See* PX4 and PX5.

[22]    Mr. Beveridge established these accounts with initial minimal deposits of his personal funds.

$15,000 from one Jerome Russell's operating accounts to Lucknow.[23] Beginning on September 6, 2002, and continuing almost every month thereafter, Mr. Beveridge caused $11,667 to be wired from IBP to Lucknow (each, a "Lucknow Payment" and, collectively, the "Lucknow Payments").

On November 19, 2002, Mr. Beveridge purchased Marksman Resources, Ltd. ("Marksman"), another British Virgin Islands corporation, from Beauson. Like Lucknow, Marksman was based in Hong Kong and had a Hong Kong based nominee director.[24] At trial Mr. Beveridge admitted that Marksman never had any employees and never engaged in any business activities. Mr. Beveridge also testified that Marksman maintained a Hong Kong bank account.

In January of 2003, auditors for IBP discovered the Lucknow Payments and, through the auditors, J. Perry learned of them. J. Perry testified that he promptly confronted Mr. Beveridge about the Lucknow Payments. He further testified that Mr. Beveridge claimed the Lucknow Payments constituted part of his compensation, that they had been occurring for years, and that he had assumed J. Perry was aware of them.[25] After hearing Mr. Beveridge's explanation, J. Perry decided to allow the payments to continue, though he testified he was concerned about the resulting level of compensation to Mr. Beveridge (including the Lucknow Payments $250,000 per year), which he considered excessive for running of a company of IBP's size and in its financial situation.

---

[23]    In her deposition Gonzales testified that Mr. Beveridge told her that the transfer was for "components".

[24]    Che served as the nominee director of both Lucknow and Marksman. *See* PX20 and PX5.

[25]    At trial Mr. Beveridge claimed that he informed J. Perry of the Lucknow Payments some time in August of 2002. The court considers the testimony of J. Perry more credible and finds that he did not learn of the Lucknow Payments until January of 2003.

Mr. Beveridge continued authorizing and implementing the Lucknow Payments until mid-2004, when IBP's bank changed its wire transfer policy. In mid-2004 the bank began to require that a wire-transfer be initiated either in person, or electronically. At this point, though Mr. Beveridge continued to authorize them, J. Perry began initiating electronically all of IBP's wire transfers, including the Lucknow Payments.

In all, IBP wired Lucknow Payments totaling $354,513.[26] As a result of the initial deposit of $500 required to open the account, the $15,000 (which was reduced to $14,992 when bank fees were subtracted) transfer made from Jerome Russell before IBP took over, $7,492 of unknown origin, and interest,[27] $23,007.82 was deposited in Lucknow's bank account that is not attributable to the Lucknow Payments. The evidence shows that a total of $20,500 was withdrawn prior to August 5, 2004. *See* PX58. At trial Mr. Beveridge testified that some money had been withdrawn from Lucknow's bank account prior to August 5, 2004, but he did not describe how the money was spent. Subtracting the $20,500, and adjusting for interest and fees, as of August 5, 2004, Lucknow had $310,287.79 in its account.[28]

On August 9, 2004, Mr. Beveridge transferred $308,000 from one of Lucknow's bank accounts to Marksman's bank account. *See* PX59. On August 11, 2004, Mr. Beveridge caused $307,500 to be wired from Marksman's bank account to Allegiance

---

[26]    This is the amount that IBP has calculated was transferred to Lucknow between the time IBP took over the assets of Jerome Russell and Hay-Tech and the termination of the Beveridges. *See* PX53. The court has not independently verified the total amount of the Lucknow Payments. However, the Beveridges have not disputed IBP's calculations.

[27]    It is impossible for the court to determine the amount of interest attributable to Lucknow Payments versus that attributable to funds from other sources. In any event, the total amount of interest is negligible. In its calculations, for convenience, the court treats 90% of the interest as derived from Lucknow Payments.

[28]    All Lucknow Payments were wired to the same account, Bank of East Asia account number 248-25-00622-7. PX58. Lucknow's other accounts experienced no activity relevant to the Adversaries.

Title Company ("Allegiance"). PX67. At trial Mr. Beveridge testified that the $307,500

transfer to Allegiance served as down payment on a house located at 2224 Lakeridge

Drive, Grapevine, Texas 76051 (the "Grapevine Property") purchased by the Beveridges.

### C. Mustang History and Payments and Trade Shows

One of Mrs. Beveridge's primary responsibilities in her employment with both

Pro-Style and IBP was to travel to trade shows as a representative of Jerome Russell and

to take product orders and generate awareness of the Jerome Russell brand at those

shows. At trial Mrs. Beveridge testified that she attended thirty-plus trade shows each

year.[29] Mrs. Beveridge paid many expenses incurred at trade shows with credit cards held

in her name or Mr. Beveridge's name; statements issued for these credit cards were then

paid directly by Pro-Style or IBP.[30]

At some point, while Pro-Style still owned Jerome Russell, Rice, who testified to

his high opinion of Mrs. Beveridge's work, suggested to Mr. Beveridge that Mrs.

Beveridge be paid commissions on sales that she generated at trade shows. Mr. Beveridge

asked Rice to present the idea to Bernstein. Shortly before IBP's acquisition of Jerome

Russell, Mr. Beveridge[31] adopted Rice's suggestion.[32] Mr. Beveridge directed Jerome

---

[29]     IBP contended that the Beveridges traveled to trade shows at company expense more for their own
pleasure than for the good of Jerome Russell. The court does not find this contention to be
supported by the record. Rice testified that the difference between the thirty-plus shows attended
during the Beveridges' regime and the handful of shows attended after their departure was
attributable to different business strategies. Mr. Beveridge's testimony provided a reasonable
explanation for attendance even at shows where Jerome Russell was constrained in its ability to do
business. All the testimony including that of Mr. Beveridge, Rice, and Hughes suggests that the
Beveridges worked hard when attending shows.

[30]     The uncontested testimony of the Beveridges was that Jerome Russell and Hay-Tec lacked the
necessary credit to obtain company credit cards. The Beveridges also had other credit cards that
were meant for their personal expenses.

[31]     The court cannot determine whether Bernstein ever authorized Mrs. Beveridge's commissions;
however, the court finds that, as president of Jerome Russell, Mr. Beveridge had the authority to
authorize commissions for Mrs. Beveridge.

Russell's employees to record all sales written at trade shows as attributable to "SHOW05" on Jerome Russell's books. He further directed that commissions be paid on those sales. Finally, he ordered that commissions be payable to SHOW05 ("Mustang Payments") should be paid to Mustang Enterprises, Inc. ("Mustang").[33]

Mustang, a shell corporation like Lucknow and Marksman, is organized under the laws of Nevada and was incorporated on June 19, 2002 (PX9) by Corporate Services Center, Inc. ("CSC"). It was purchased by Mr. Beveridge on July 17, 2002. PX10. Mr. Beveridge also engaged CSC to obtain a phone number and Nevada mailing address for Mustang.[34] PX10. Mustang's phone number and address (which was a mail drop at The UPS Store) were listed on the Jerome Russell rep sheet.

Mustang was owned 50% each by the Beveridges. Upon purchasing Mustang, Mr. Beveridge became director and president of Mustang. Mr. Beveridge also opened a bank account in Mustang's name, which he controlled. *See* PX32. Mrs. Beveridge's first commission check was paid to Mustang on September 5, 2002 (PX31), after IBP had taken over the assets and businesses of Jerome Russell and Hay-Tec. PX28.

### D. Car Payments and Life Insurance Policy

Jerome Russell owned a 1989 Jaguar (PX36) which was used by Mr. Beveridge. At trial Mr. Beveridge testified that by 2002 the 1989 Jaguar had become unreliable, and

---

[32]     Williams testified that Mrs. Beveridge was the only salaried employee at Jerome Russell who received commissions. There was at least one salaried employee at Hay-Tec who received commissions as well.

[33]     Jerome Russell had a "rep sheet" that listed all of its commissioned salespeople. Mustang was listed for SHOW05 commissions on the rep sheet with a contact phone number and address but, unlike every other sales representative listed, no contact person. Therefore, it would not have been apparent from the rep sheet alone that Mustang was connected to the Beveridges in any way.

[34]     In addition, CSC also obtained an Employer Identification Number for the newly formed entity.

Bernstein agreed Mr. Beveridge could purchase a car in Mr. Beveridge's name. Mr. Beveridge testified that Bernstein agreed Jerome Russell would make the payments on the new car, so long as those payments were less than the cost of leasing a car. He further testified that after receiving permission from Bernstein, he sold the 1989 Jaguar.[35] Mr. Beveridge then purchased from Texascarsdirect.com a used 1998 Jaguar XK8 (the "Jaguar XK8"). PX37. Mr. Beveridge testified that he used $15,976.77 of his own funds for the down payment,[36] but that Jerome Russell made the monthly car payments. He also testified without contradiction that several senior executives (*e.g.*, Gonzales and Roy Hurley, Hay-Tec's Vice President) received car allowances of approximately $5,000 each per year from Jerome Russell or Hay-Tec.

In February of 2004, Mr. Beveridge purchased for Mrs. Beveridge a Jaguar Vanden Plas (the "Vanden Plas") from Texascarsdirect.com. The $5,000 down payment was funded from Mustang's bank account. PX32. At trial the Beveridges did not dispute the assertion that some of the car payments for the Vanden Plas were taken from Mustang's bank account. The Beveridges have claimed the Vanden Plas as exempt property in their chapter 7 bankruptcy case.

Mr. Beveridge testified that, as provided in his employment agreement (DXA), Pro-Style purchased and maintained, on his life, an insurance policy from Business Men's Assurance Company (the "Insurance Policy"). Shortly before IBP purchased Pro-Style, Bernstein, on behalf of Pro-Style, attempted to transfer the Insurance Policy to Mr.

---

[35]     Mr. Beveridge testified the proceeds of the sale were realized by Jerome Russell.

[36]     IBP presented evidence, and the jury in the State Court Action (as defined below) found, that the $15,976.77 represented proceeds of sale of the 1989 Jaguar. While the court accepts the jury's finding for purposes of quantifying IBP's claims in the Beveridges' chapter 7 case, the court does not, for purposes of the Adversaries, consider it credible that a 1989 Jaguar would sell for nearly $16,000 in 2002.

Beveridge. PX14. Mr. Beveridge testified that the transfer of the Insurance Policy was

ineffective because Bernstein neglected to have the transfer properly notarized.

According to Mr. Beveridge, because the transfer failed, IBP remains the owner and

beneficiary of the Insurance Policy.[37]

### E. Inventory

In 2004, after considering various options, in the hope of reducing costs through

use of a third party logistics warehouse ("3PL"), J. Perry decided to move the majority of

Jerome Russell's warehouse and distribution operations from California to Colorado.[38]

Before the move Mr. Beveridge instructed Jerome Russell employees to ship certain

pallets, which were wrapped in black plastic and labeled with his name (the "Black

Pallets"), to 220 Labs. Mr. Beveridge testified that the Black Pallets contained his

personal property. When the Black Pallets were eventually opened[39] it was discovered

that some of the goods on them might be inventory of IBP. Mr. Beveridge testified that

he never ordered that any of IBP's property be shipped to, or stored at, 220 Labs in his

name. IBP contends all inventory received by 220 Labs from Jerome Russell's California

warehouse belongs to it.

---

[37]    As the transfer was ineffective, ownership of the Insurance Policy presumably passed to IBP when
it acquired Jerome Russell's assets.

[38]    At trial R. Perry testified that IBP discontinued all of Jerome Russell's in-house warehousing
operations, and that IBP retained the services of a 3PL that had locations in both California, and
Colorado. He further testified that IBP warehoused its finished inventory in Colorado while
unfinished components were warehoused in California.

[39]    There was a long delay before the Black Pallets were opened as a result of the refusal of 220 Labs
and its owners to cooperate with IBP's attorneys. 220 Labs continues to hold and control the
inventory shipped there. Either the inventory at 220 Labs was property of IBP or, upon the
Beveridges' chapter 7 filing, became property of the estate. Thus the conduct of 220 Labs
constitutes the exercise of control by 220 Labs over property which might belong to the estate.
This amounts to a clear violation of section 362(a)(3) of the Bankruptcy Code (the "Code") (11
U.S.C. §§ 101 *et seq.*). *See Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 303 (5th Cir. 2005).

In the course of moving the Jerome Russell and Hay-Tec inventory, J. Perry determined the inventory should be purged of items that did not sell. Selecting and marking inventory for purging was a multi-person effort in which both Mr. Beveridge and R. Perry participated. R. Perry testified that Mr. Beveridge changed the marking of some inventory from a designation for trash disposal to a designation for retention. R. Perry and Harper both testified that Mr. Beveridge's conduct could have been for the purpose of converting inventory to his use through eliminating it from the books while not disposing of it. Mr. Beveridge, on the other hand, testified that he had simply concluded that a good use might be found for some of the inventory originally destined for the trash.

The inventory to be purged was to be marked with a red sticker, while that to be retained was to be marked with a green sticker. An intermediate category – which apparently was also taken off the books – was to be designated with a yellow sticker. The changes made by Mr. Beveridge were from red to yellow – and, thus provided no more opportunity to Mr. Beveridge for conversion of inventory than had the designation been yellow from the beginning.

IBP also contends that the Beveridges converted inventory to their own benefit at cash trade shows. It is IBP's contention that, at such a show, the Beveridges would sell inventory shipped there for sale and pocket the proceeds. Harper's testimony was offered in support of this argument: that the sum of the inventory returned from a given show and the proceeds turned over by the Beveridges was less than called for by the booked value of the inventory, thus suggesting to Harper conversion of some of the shipped inventory.

**F. IBP's Termination of the Beveridges' Employment**

Gonzales, following a leave necessitated by a serious illness, left IBP's employ in the Fall of 2004. There is evidence that she and Mr. Beveridge had a falling out, but Gonzales maintained contact with J. Perry. In an email on January 17, 2005, she informed him that she had learned that IBP was paying a commission to Mustang, and that Mustang belonged to the Beveridges. PX196. At trial J. Perry testified that upon receiving Gonzales's email, he scheduled a trip to Jerome Russell's office in California in order to investigate Mustang. When J. Perry arrived at Jerome Russell's office the Beveridges were out of town and the computer with Jerome Russell's accounting data had crashed.[40]

Jerome Russell's accounting manager, Hughes, kept a backup check register on her personal computer which was not affected by the computer failure. The backup check register reflected that the Mustang Payments began after IBP took over Jerome Russell (PX30). Further inquiry by J. Perry uncovered that, contrary to Mr. Beveridge's representation to him in January of 2003, only the one payment of $15,000 was made to Lucknow before IBP purchased the assets of Jerome Russell and Hay-Tec. PX54.

J. Perry made a second trip to California and met with Mr. Beveridge on either February 1 or 2, 2005.  At a breakfast meeting, he questioned Mr. Beveridge about the commission payments to Mustang and Mr. Beveridge's prior statements about the Lucknow Payments. According to J. Perry, Mr. Beveridge could offer no explanation. At the conclusion of the meeting J. Perry terminated the Beveridges' employment.

### G. Texas Lawsuit and Bankruptcy Petition

---

[40]      During trial IBP repeatedly intimated that Mr. Beveridge caused Jerome Russell's computer to crash. The record does not provide sufficient support for the inference that Mr. Beveridge caused the computer crash, and the court finds that he did not cause the computer to crash.

Following aborted litigation initiated by IBP and the Beveridges in Colorado and California, IBP filed a lawsuit (the "State Court Action") against the Beveridges in the 48th Judicial District Court in Tarrant County, Texas. The State Court Action was set for jury trial in early 2008. On February 10, 2008, as the State Court Action neared submission to the jury, the Beveridges filed for relief under chapter 7 of the Code in this court, thus staying the State Court Action. On February 12, 2008, the court modified the stay to allow completion of the jury trial to liquidate IBP's claims against the Beveridges.[41] At the conclusion of the trial the jury rendered its verdict, which was largely in favor of IBP, and the state district judge accepted that verdict. This court then entered a second order modifying the stay, which permitted the state district judge to enter a final judgment (the "Liquidated Judgment"), which he did on May 15, 2008.[42]

IBP then filed adversary number 08-04096 on April 23, 2008, challenging certain of the Beveridges' claims of exemptions under Code § 522(b)(2) and Texas law, including claims to exempt the Grapevine Property, the Jaguar XK8, the Vanden Plas, and the Insurance Policy. IBP filed adversary number 08-04114 on May 23, 2008, asking that the court hold certain of the Beveridges' debts to IBP to be non-dischargeable. The Adversaries were subsequently consolidated as described above.

## II. Discussion

---

[41]    The court specifically reserved to itself all issues other than liquidation of IBP's claim, including any questions of fact affecting dischargeability or exemptions.

[42]    The State Court Action only addressed some of IBP's claims against the Beveridges; thus the Liquidated Judgment was in the total amount of $674,472.93, made up of (1) $369,513 for the Lucknow Payments; (2) $200,043 for the Mustang Payments; (3) $23,428 for payments on the Insurance Policy; (4) $15,976.77 for proceeds from the sale of Jerome Russell's Jaguar; (5) $23,512.16 for car payments made on the Jaguar XK8; and (6) $42,000 for attorneys' fees related to avoidance of a mortgage on the Grapevine Property. IBP has filed a claim in the Beveridges' chapter 7 case in the amount of $4,179,475.68.

As a preliminary matter, the task at hand must be defined. It is not the court's chore to determine the allowable amount of the IBP claim. Rather it is the court's job to determine what portion of IBP's claim, if any, is non-dischargeable. It may be that IBP is entitled to a claim in the Beveridges' chapter 7 case against the estate for conduct that amounts to misfeasance but not malfeasance. For example, the Beveridges may have mismanaged affairs entrusted by IBP to their care or may have wasted assets of IBP through unwise business practices and decisions. Such conduct could give rise to a right to payment and so would support a claim in the chapter 7 case. *See* Code § 101(5). However, absent meeting one of the tests for non-dischargeability established in the Code, the Beveridges' liability on claims which may be allowed in their chapter 7 case will not survive their discharge. In the Adversaries, the court thus need only determine the amount of claims which will survive the discharge or affect the Beveridges' entitlement to an exemption.[43]

## A. Analysis of the Law

IBP has asserted that its claims are non-dischargeable under a number of Code provisions. Specifically, IBP contends that the Beveridges' debts are non-dischargeable under Code § 523(a)(2)(A) (debts incurred through a debtor's false pretenses, false representation, or actual fraud), Code § 523(a)(4) (debts incurred through a debtor's fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny), and Code § 523(a)(6) (debts incurred through a debtor's willful and malicious harm to person or property). IBP claims that debts arising from the Lucknow Payments, Mustang Payments, car payments for the Jaguar XK8 and Vanden Plas, premium payments on the Insurance

---

[43]    In fact, the court concludes disposition of the exemption issues does not require quantification of any dischargeable claim.

Policy, related to inventory on the Black Pallets, and from the personal purchases on IBP

paid credit cards are non-dischargeable debts. IBP also requests imposition of a

constructive trust or equitable lien on the Grapevine Property, the Jaguar XK8, the

Vanden Plas, the Insurance Policy, and inventory on the Black Pallets.[44] Besides its

objection to exemption of the Grapevine Property, the Jaguar XK8, the Vanden Plas, and

the Insurance Policy, IBP further contends that the Beveridges' claimed exemptions for a

Ford Excursion, two handguns, a digital camera, and household furnishings (the

"Personal Items") should be disallowed pursuant to section 522 of the Code.

### 1. Burden of Proof

It is well established that the burden of proof a creditor must meet for a debt to be

found non-dischargeable is the standard civil burden of showing entitlement to relief by a

preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 287 (1991). A fact

is proven by a preponderance of the evidence if the finder of fact – here the court – finds

it more likely than not, based on the evidence, that the fact is true. *See, e.g.*, *In re Bell*

*Petroleum Servs., Inc.*, 3 F.3d 889, 909-910 (5th Cir. 1993) (Parker, D.J., sitting by

designation, concurring in part and dissenting in part). The Supreme Court has opined

that the preponderance of the evidence test is designed to apportion risk of error equally

between the parties. *See, e.g., Herman & MacLean v. Huddleston,* 459 U.S. 375, 390

(1983). Thus it is the duty of this court to weigh the evidence presented to it respecting

each claim made by IBP and determine, considering the credibility of the source of the

---

[44]     IBP is also asking the court to avoid a mortgage on the Grapevine Property and for attorneys' fees
related to prosecuting that issue. The mortgage on the Grapevine Property was released before the
issue came before the court, so it is unnecessary for the court to address it. As to the attorneys'
fees, they are included in the Liquidated Judgment and so are properly claimed. On the other hand,
because the fees were apparently incurred after release of the mortgage, they represent
dischargeable debt.

evidence, whether IBP has presented evidence of a greater weight than contrary evidence of each fact necessary to support each claim of non-dischargeability.

Unlike non-dischargeability actions, in which, prior to *Grogan*, some courts had imposed a higher burden of proof than preponderance of the evidence, there has never been controversy concerning the required burden of proof for imposition of a constructive trust or determination that a claimed exemption is invalid. The burden of proof in such disputes is the standard burden in civil matters: the plaintiff must show by a preponderance of the evidence facts that support the requested relief.

### 2. Section 523(a)(2)(A)

Code § 523(a)(2)(A) provides that debts incurred through "false pretenses, a false representation, or actual fraud" are subject to exception from a debtor's discharge. In order for a debt to fall within Code § 523(a)(2)(A) the debtor's fraud or false representation must involve the debtor's "moral turpitude or intentional wrong." *Vizzini v. Vizzini (In re Vizzini)*, 348 B.R. 339, 343 (Bankr. E.D. La. 2005), *aff'd*, 234 Fed. Appx. 234 (5th Cir. 2007) (quoting *In re Chavez*, 140 B.R. 413, 419 (Bankr. W.D. Tex. 1992)). Fraudulent acts which are implied in law and may exist in the absence of bad faith are insufficient to deny discharge. *Id.* The Fifth Circuit has distinguished between the elements of a claim seeking denial of discharge for (1) false pretenses and representations and (2) actual fraud. *Recoveredge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir. 1995).

In order for the court to deny discharge of a debt under section 523(a)(2)(A) on the basis that the debt is attributable to the debtor's false pretenses or representations, the plaintiff must prove the debtor's representations were "(1) knowing and fraudulent falsehoods, (2) describing past or current facts, (3) that were relied upon by the other

party." *In re Allison*, 960 F.2d 481, 483 (5th Cir. 1992), *later cited in Pentecost*, 44 F.3d

at 1292. Courts have consistently found that a debtor's silence regarding a material fact

equates to a material representation sufficient to support a denial of discharge. *See, e.g.*,

*Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1288 (8th Cir. 1987); *AT&T*

*Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 403 (5th Cir. 2001); *Gen.*

*Elec. Capital Corp. v. Acosta (In re Acosta)*, 2003 U.S. Dist. LEXIS 23450, *52-53 (E.D.

La. Dec. 30, 2003); *Hughes v. Wells (In re Wells)*, 2006 Bankr. LEXIS 330, *54 (Bankr.

N.D. Tex. Mar. 8, 2006).

The requirements for denying discharge of a debt for actual fraud pursuant to

section 523(a)(2)(A) are: "(1) the debtor made representations; (2) at the time they were

made the debtor knew they were false; (3) the debtor made the representations with the

intention and purpose to deceive the creditor; (4) that the creditor relied on such

representations; and (5) that the creditor sustained losses as a proximate result of the

representations." *Pentecost*, 44 F.3d at 1293 (quoting *Bank of La. v. Bercier (In re*

*Bercier),* 934 F.2d 689, 692 (5th Cir. 1991) (internal footnote omitted)).

The Fifth Circuit does not require that a creditor have *reasonably* relied on the

representations of the debtor in order to prove non-dischargeability under section

523(a)(2)(A).  *Allison*, 960 F.2d at 483. All that is required in the Fifth Circuit is actual

reliance.[45]

### 3. Section 523(a)(4)

Code § 523(a)(4) provides that a debt may be declared non-dischargeable if it

arose by reason of the debtor's "fraud or defalcation while acting in a fiduciary capacity,

---

[45]     Some circuits require that creditor's reliance have been reasonable. *See* cases cited in *Allison*, 960
F.2d at note 3.

embezzlement, or larceny." The phrase "fiduciary capacity" only modifies fraud and defalcation; therefore, a debt may be held non-dischargeable for embezzlement or larceny if the debtor was not a fiduciary. *Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998); 4 COLLIER ON BANKRUPTCY ¶ 523.10(1)(d) (15th ed. rev. 2009).

For purposes of section 523(a)(4), "embezzlement" is defined as the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."  *Miller*, 156 F.3d at 598 (quoting *Greyhouse Line Inc. v. Thurston (In re Thurston)*, 18 B.R. 545, 550 (Bankr. M.D. Ga. 1982)). In order for a debt to be deemed non-dischargeable as embezzlement under section 523(a)(4) the evidence must show "that the creditor entrusted the debtor with his property, that the debtor misappropriated the property, and that the debtor intended to defraud the creditor." *E.E. Norwood & Flat Top Dairy Go Round, LP v. Hicks (In re Hicks)*, 384 B.R. 443, 451 (Bankr. N.D. Tex. 2008) (citing *Miller*, 156 F.3d at 602). "Fraudulent intent may be inferred from the conduct of the Debtor and from circumstances of the situation." *Winn v. Holdaway (In re Holdaway)*, 388 B.R. 767 (Bankr. S.D. Tex. 2008) (quoting *In re Harrell,* 94 B.R. 86, 91 (Bankr. W.D. Tex. 1988)).

Under section 523(a)(4) non-dischargeability of a debt because of fraud or defalcation by the debtor requires a showing that (1) the debtor was a fiduciary, and (2) the debt arose through fraud or defalcation. *See Chavez*, 140 B.R. at 422. Federal law determines what constitutes a fiduciary for the purposes of section 523(a)(4). *Miller*, 156 F.3d at 602. In order for a fiduciary relationship to exist for the purposes of section 523(a)(4) there must be an express or technical trust relationship; a constructive trust relationship is insufficient to support the proposition that someone is a fiduciary for the

purposes of 523(a)(4). *Id.* The court must look to applicable, typically state, law to

determine whether a trust relationship exists. *Bennett v. Bennett (In re Bennett)*, 989 F.2d

779, 784 (5th Cir. 1993). The technical or express trust requirement is not limited to

trusts that arise by virtue of a formal trust agreement; it also includes relationships in

which a trust-type relationship is imposed by common law or statute. *Id.*

Once a valid fiduciary relationship has been established, a debt may be excepted

from a debtor's discharge under section 523(a)(4) because it was incurred through fraud

or defalcation. The definition of fraud under section 523(a)(4) is the same as that under

section 523(a)(2)(A). *In re McDaniel*, 181 B.R. 883, 887 (Bankr. S.D. Tex. 1994);

In determining the non-dischargeability of a debt under section 523(a)(4),

defalcation is defined as "a willful neglect of duty, even if not accompanied by fraud or

embezzlement." *Schwager v. Fallas (In re Schwager)*, 121 F.3d 177, 184 (5th Cir. 1997)

(quoting *Moreno v. Ashworth* (*In re Moreno*), 892 F.2d 417, 422 (5th Cir. 1990)). Unlike

fraud, defalcation does not require actual intent; rather, defalcation only requires reckless

conduct by the debtor. *See Schwager*, 121 F.3d at 185; 4 COLLIER ON BANKRUPTCY ¶

523.10(1)(b) (15th ed. rev. 2009).

### 4. Section 523(a)(6)

Section 523(a)(6) provides for denial of the discharge of debts arising through

"willful and malicious injury by the debtor to another entity or to the property of another

entity." In order for conduct to qualify as willful and malicious the debtor must act with

"either an objective substantial certainty of harm or a subjective motive to cause harm."

*Williams v. IBEW Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003) (quoting

*Miller*, 156 F.3d at 606). Injuries that are negligently or recklessly inflicted are

insufficient to meet the requirements of section 523(a)(6). *Kawaauhau v. Geiger*, 523

U.S. 57, 64 (1998).

Injuries covered by section 523(a)(6) are not limited to physical damage or

destruction; harm to personal or property rights is also covered by section 523(a)(6). 4

COLLIER ON BANKRUPTCY ¶ 523.12(4) (15th ed. rev. 2003). Willful conversion of

another's property falls within section 523(a)(6). *See Chrysler Credit Corp. v. Perry*

*Chrysler Plymouth, Inc.*, 783 F.2d 480, 486 (5th Cir. 1986); 4 COLLIER ON BANKRUPTCY

¶ 523.12(4) (15th ed. rev. 2004).

### 5. Constructive Trust

The imposition of a constructive trust is governed by state law. *Bradley v. Ingalls*

*(In re Bradley)*, 501 F.3d 421, 431 (5th Cir. 2007) (citing *Southmark Corp. v. Grosz (In*

*re Southmark Corp.)*, 49 F.3d 1111, 1118 (5th Cir. 1995). Generally accepted choice of

law principles hold that issues regarding real property are governed by the state in which

the property is located. *See United States v. Little Lake Misere Land Co.*, 412 U.S. 580,

591 (U.S. 1973); *Anderson v. Conine (In re Robertson)*, 203 F.3d 855, 859 (5th Cir.

2000) (citing *Butner v. United States*, 440 U.S. 48, 54 (1979)).  Because the Grapevine

Property is located in Texas, the court will utilize Texas law in making its determination

of whether a constructive trust should be imposed on the property.[46] The court will also

utilize Texas law for the question of the imposition of a constructive trust on the Vanden

Plas because of the connections with Texas. The car was purchased and is currently

located in Texas and the Beveridges reside in Texas.

---

[46]     As discussed below, the court need not reach the issue of imposition of a constructive trust on the
        Jaguar XK8 or the Insurance Policy.

For a constructive trust to be imposed under Texas law the plaintiff must show
"(1) the debtor has committed actual fraud or has committed constructive fraud through
the breach of a preexisting fiduciary or confidential relationship; (2) the debtor would be
unjustly enriched by retaining the proceeds of the wrong; and (3) there is a traceable res
upon which to impress the trust." *Bradley*, 501 F.3d at 432 (citing *Haber Oil Co. v.
Swinehart (In re Haber Oil Co.)*, 12 F.3d 426, 437 (5th Cir. 1994) (applying Texas law)).

For the purposes of holding property in a constructive trust, actual fraud requires
showing that "(1) a material representation was made; (2) the representation was false;
(3) the speaker made the representation knowing it was false or made it recklessly
without any knowledge of its truth and as a positive assertion; (4) the speaker made the
representation with the intent that it be relied upon by the party; (5) the party acted in
reliance on the misrepresentation; and (6) the party thereby suffered injury." *See
Swinehart* 12 F.3d at 437. These elements are essentially the same as the elements of
actual fraud necessary to make a debt non-dischargeable under section 523(a)(2)(A).
*Compare Pentecost*, 44 F.3d at 1293, *with Swinehart*, 12 F.3d at 437. Thus, if funds used
to purchase the Grapevine Property or the Vanden Plas were obtained so as to give rise to
a non-dischargeable debt, the first prong of the test for imposing a constructive trust on
the Grapevine Property or the Vanden Plas has been met.

Courts have held that the lowest intermediate balance test is a suitable method for
tracing trust funds that have been comingled with other funds. *See, e.g., Old Republic
Nat'l Title Ins. Co. v. Tyler (In re Dameron)*, 155 F.3d 718, 724 (4th Cir. 1998); *In re
Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1063 (3d Cir. 1993); *United States v.
McConnell*, 258 B.R. 869, 875 (N.D. Tex. 2001). Under the lowest intermediate balance

test, "if the amount on deposit in the commingled fund has at all times equaled or exceeded the amount of the trust, the trust's funds will be returned in their full amount." *Old Republic*, 155 F.3d at 724. In other words, the lowest intermediate balance test creates a legal fiction that when funds are withdrawn from a trust account, non-trust funds are withdrawn first. *Id*.

## B. Application of the Law

### 1. The Jaguar XK8

IBP has asserted that the loan and insurance payments that IBP made with respect to the Jaguar XK8 (the "Car Payments") should be held to be non-dischargeable debt under Code § 523(a)(2)(A), Code § 523(a)(4) and Code § 523(a)(6) and that the Jaguar XK8 should be placed in a constructive trust for IBP's benefit or that an equitable lien be imposed on the Jaguar XK8.[47]

At trial J. Perry testified that he intended Mr. Beveridge, as an employee of IBP, to have a benefits package comparable to that of other Jerome Russell and Hay-Tec employees. Mr. Beveridge testified without contradiction that some other senior Jerome Russell and Hay-Tec employees received car allowances of approximately $5,000 per year. There was also a car allowance provision in Mr. Beveridge's employment agreement with Pro-Style (DXA ¶ 5.4).[48] Based on the evidence, the court finds that Mr.

---

[47] The court understands from the evidence at trial that Mr. Beveridge has sold the Jaguar XK8. Thus the questions of constructive trust and equitable lien are mooted. While it may be possible to trace the proceeds from the sale of the Jaguar XK8, the court does not have the necessary documentation to do so.

[48] As discussed below, the court does not consider existence of the employment agreement to justify unilateral imposition of its terms on IBP. In the case of benefits, however, the agreement and compliance with the agreement by Jerome Russell during Bernstein's tenure provide some evidence in support of Mr. Beveridge's argument respecting his entitlements. The evidence suggests that, however Bernstein may have otherwise ignored or abrogated Mr. Beveridge's

Beveridge had received a car allowance before IBP acquired the assets of Pro-Style, and

that Mr. Beveridge's car allowance continued thereafter. The court further finds that Mr.

Beveridge's car allowance was consistent with benefits afforded other senior employees

of IBP.

Based on these findings, the court concludes that IBP was not fraudulently

induced to make the Car Payments, and, thus, IBP has not proven one of the elements

required by Code § 523(a)(2)(A). Likewise, the facts do not support a determination that

the Car Payments were embezzled or caused to be made fraudulently by Mr. Beveridge

acting in a fiduciary capacity (Code § 523(a)(4)). Finally, because the court finds the

payments were consistent with J. Perry's expectations, causing them cannot amount to

willful and malicious injury as required by Code § 523(a)(6). Accordingly, the Car

Payments do not give rise to a non-dischargeable debt.

### 2. The Insurance Policy

IBP has claimed that Mr. Beveridge caused ownership of the Insurance Policy to

be transferred to his name, and that, after ownership of the Insurance Policy was

transferred, Mr. Beveridge caused IBP to continue making premium payments on the

Insurance Policy. *See* PX52. IBP asks to have the payments it made on the Insurance

Policy declared non-dischargeable debt under Code § 523(a)(2)(A), Code § 523(a)(4) and

Code § 523(a)(6), and to have the Insurance Policy placed in a constructive trust or to

have an equitable lien imposed on the Insurance Policy for IBP's benefit.

At trial Mr. Beveridge testified that Bernstein attempted to transfer ownership of

the Insurance Policy to him, but that the transfer was ineffective because the document

employment agreement, unlike, for example, the Lucknow Payments, he did provide Mr.
Beveridge with a vehicle as contemplated in the agreement.

purporting to effect the transfer was not notarized. J. Perry testified that he believed that

Mr. Beveridge owned the Insurance Policy, but that IBP had not asked the insurance

company who owned the Insurance Policy or who was designated as its beneficiary.

The court accepts Mr. Beveridge's testimony and holds that Mr. Beveridge did

not obtain ownership of the Insurance Policy. Since, presumably, now IBP owns the

policy and may take advantage of its surrender value or retain it and gamble on Mr.

Beveridge's health, the premiums paid benefited IBP and not Mr. Beveridge.[49] The court

need not reach whether the payment of the premiums would give rise to a non-

dischargeable debt if the transfer of the policy to Mr. Beveridge had been effective; as it

is there is no debt owed by the Beveridges by reason of the premiums, and the question of

dischargeability – as well as any question of whether the court should impose a

constructive trust or equitable lien – is moot.

### 3. Inventory

IBP has alleged that the Beveridges stole IBP inventory, *inter alia*, through

relabeling during the inter-warehouse transfer and either sold it and retained the proceeds,

or shipped and stored the stolen inventory at 220 Labs. IBP has also alleged that the

Beveridges sold IBP inventory at trade shows and retained some of the proceeds from

those sales. IBP requests that any funds the Beveridges received through the sale of IBP

inventory and the value of any IBP inventory the Beveridges stored at 220 Labs be held

to be non-dischargeable debt under Code § 523(a)(2)(A), Code § 523(a)(4) and Code §

523(a)(6). IBP also asks with respect to inventory at 220 Labs that it be placed in a

---

[49] As Mr. Beveridge does not own the Insurance Policy, the Beveridges' claim that it is exempt cannot be sustained and IBP's request that the exemption of the Insurance Policy be denied must in effect be granted.

constructive trust for the benefit of IBP or that the court to impose an equitable lien on such inventory or the proceeds derived from its sale.

IBP alleged that Mr. Beveridge wrote inventory off of IBP's books, *inter alia*, in connection with the inter-warehouse transfer, but retained the inventory and shipped it to 220 Labs. At trial Mr. Beveridge admitted that he caused the Black Pallets to be shipped to 220 Labs. He further testified that he believed that all of the goods contained on the Black Pallets were his personal property, and that he was surprised to learn that some of IBP's inventory was on the Black Pallets. Mr. Beveridge adequately explained that some of the goods on the Black Pallets, which may have appeared to be IBP's inventory, were his personal property.[50] IBP failed to offer evidence sufficient to rebut Mr. Beveridge's explanation.

Moreover, the location of the Black Pallets is known and there has been no evidence offered that any conversion of the goods transported on them has occurred. Therefore, there is no need to address the Black Pallets in terms of Code § 523. The goods on them either belong to the Beveridges or IBP. If the former, ownership passed to the trustee upon commencement of the Beveridges' chapter 7 case. If the latter, the inventory will be returned to IBP. In the present context, the court need not address competing claims of ownership between IBP and the trustee.

IBP alleges that the Beveridges sold inventory at trade shows and retained a portion of the proceeds for themselves. However, IBP has not met its burden of proof respecting these allegations. IBP's evidence to show the Beveridges' conversion of the

---

[50]    The Black Pallets contained numerous boxes of grooming supplies and components used to make beauty supplies. Mr. Beveridge testified without contradiction that in the mid-'90s he, personally, bought a fingernail supply company and that the beauty products on the Black Pallets were left-over inventory from that purchase.

inventory and retention of proceeds was principally Harper's trial testimony. Harper's

analysis is questionable in that it was based on assumptions that the court finds

unwarranted concerning the sale price of inventory at shows *vis-à-vis* booked value. Even

if IBP had presented adequate evidence to demonstrate that inventory was in fact stolen,

IBP has failed to prove the amount of its loss. Having failed to show, by a preponderance

of the evidence, that the Beveridges converted inventory to their own profit, IBP's claim

as to the non-dischargeability of any potential debts arising from the conversion of

inventory must be denied.

### 4. Credit Card Expenses and Other Purchases

IBP contends that the Beveridges charged personal living expenses and purchases

of personal property to credit cards that were paid by IBP (the "Personal Charges"). IBP

alleges that any use of company-paid credit cards for Personal Charges creates non-

dischargeable debt to IBP under section 523(a)(2)(A), section 523(a)(4) and section

523(a)(6).

The Beveridges' jobs at IBP required them to travel. When the Beveridges were

traveling they charged travel expenses such as meals, transportation and lodging to the

credit cards, which IBP subsequently paid.[51] In addition, the Beveridges sometimes paid

for business meals (e.g., with J. Perry) near their home and IBP's office or made

purchases for Jerome Russell or Hay-Tec on their credit cards.

---

[51]    IBP, through Harper's testimony, contended that Mr. Beveridge in particular failed to provide
documentation to support payment of his credit card charges by IBP. Mr. Beveridge testified that
the backup was provided and maintained at Jerome Russell's offices. He also noted that IBP's
auditors did not question the credit card payments – presumably because the auditors were
satisfied with the documentation of the charges. On the record before it, the court cannot conclude
that IBP has satisfactorily rebutted this testimony. Nothing in Saitta's deposition contradicts Mr.
Beveridge's testimony, and the court therefore accepts that the auditors were satisfied with Mr.
Beveridge's expense reports.

At trial Harper questioned the business purpose of a number of the transactions on the Beveridges' credit card statements. As Harper admitted, however, her conclusions that individual charges were not for business purposes were speculative, based on the apparent nature of the vendors at which the charges were made (e.g., music stores, home furnishing stores, ladies' clothing stores). In his testimony Mr. Beveridge explained many of these charges satisfactorily, often providing documentation to support his explanations. *See, e.g.*, DXFF, DXGG, and DXHH. While Mr. Beveridge did not provide a documented explanation for every charge cited by Harper (he claimed he was limited by time and other problems – a claim the court finds credible given the number of charges questioned by Harper), the court is satisfied that his explanations for some of the Personal Charges were sufficient to rebut generally Harper's testimony respecting other charges; the court thus concludes that IBP has not shown by a preponderance of the evidence that the Beveridges incurred Personal Charges at the expense of IBP.[52]

### 5. Lucknow

IBP argues that the Lucknow Payments are non-dischargeable debts of the Beveridges under Code § 523(a)(2)(A), Code § 523(a)(4) or Code § 523(a)(6). With the exception of the first payment of $15,000 which was made on August 6, 2002, the court concludes that the Lucknow Payments are not dischargeable debts as to Mr. Beveridge under section 523(a)(2)(A) and section 523(a)(4). The Lucknow Payments are dischargeable as to Mrs. Beveridge.

Because, as to Mr. Beveridge, the Lucknow Payments are non-dischargeable under section 523(a)(2)(A) or section (a)(4) the court need not consider whether the

---

[52]    The court again notes that its conclusion does not equate to a determination that the charges in question were a wise use of IBP's money. Rather, the court finds that the evidence supports the Beveridges' contention that the charges were for IBP's – not their own – benefit.

Lucknow Payments give rise to non-dischargeable debt under section 523(a)(6).

Likewise, section 523(a)(4) need only be addressed with respect to the first few Lucknow

Payments. Most of the Lucknow Payments are non-dischargeable as to Mr. Beveridge

under section 523(a)(2)(A) because they represent moneys obtained through Mr.

Beveridge's false representations and actual fraud; the first few are non-dischargeable as

representing embezzled funds pursuant to section 523(a)(4).

The evidence before the court shows that only shortly before IBP hired him did

Mr. Beveridge cause the first $15,000 payment to Lucknow. When asked, in January of

2003, about the Lucknow Payments Mr. Beveridge told J. Perry (IBP) that they were

being made in accordance with his employment agreement with Pro-Style[53] and that they

had been made regularly since long before IBP took over Jerome Russell and Hay-Tec.

The evidence thus satisfies both bases for denying discharge of a debt under section

523(a)(2)(A).

When Mr. Beveridge represented to J. Perry (IBP) that the Lucknow Payments

had been occurring for a long period of time, he knew that was false. Mr. Beveridge's

representation respecting past payments described past or current facts, and J. Perry

relied[54] on Mr. Beveridge's representation that they had a long prior history when he

---

[53]    Mr. Beveridge sought to justify the Lucknow Payments on the basis that they simply brought his
salary in line with the employment agreement. But IBP was not a party to that agreement and
nothing in the record would support a finding that IBP ever agreed to comply with the
employment agreement (though Mr. Beveridge did testify that J. Perry was aware of the agreement
before acquiring ProStyle's assets, even if the court accepted this testimony as true, it does not
mean IBP accepted the employment agreement as binding on it). Moreover, imposing the
employment agreement on IBP is not consistent with Mr. Beveridge's representation to J. Perry in
the Summer of 2002 that he was paid $110,000 per year. If Mr. Beveridge's January, 2003,
statement about the history of the Lucknow Payments had been true, the court might find in the
employment agreement some justification for those payments, as it does with respect to the Jaguar
XK8. As it is, the employment agreement does not aid Mr. Beveridge in his contention that he was
entitled to the Lucknow Payments.

[54]    The court, as discussed above, need not determine whether J. Perry's reliance was reasonable.

allowed the Lucknow Payments to continue.  Mr. Beveridge therefore obtained the

Lucknow Payments through a false representation within the meaning of Code §

523(a)(2)(A).

Alternatively, the Lucknow Payments are non-dischargeable as moneys obtained

through actual fraud within the meaning of section 523(a)(2)(A) because Mr. Beveridge

represented to J. Perry (IBP) that the Lucknow Payments began long before they actually

did. Mr. Beveridge knew this representation was false, but made it with the intent that J.

Perry would believe it and allow him to continue the Lucknow Payments. J. Perry relied

on Mr. Beveridge's representation and IBP suffered monetary loss as a result of J. Perry's

reliance.

Mr. Beveridge's deceitful intent can be inferred from the badges of fraud

surrounding the Lucknow Payments themselves. Lucknow was no more than a shell

corporation, used by Mr. Beveridge principally to collect and hold the Lucknow

Payments. Gonzales testified in her deposition that the $15,000 payment was explained

by Mr. Beveridge (falsely) as being for components for Jerome Russell. Mr. Beveridge,

rather than openly causing later payments to be made to himself, caused them to be

transferred to Lucknow. Indeed, the very use of a British Virgin Island corporation

headquartered in Hong Kong is an indicator that Mr. Beveridge did not intend that it

would become known that the payments were for his benefit. Finally, Mr. Beveridge did

all he could to prevent interaction between Jerome Russell's employees and J. Perry; this

helped keep the Lucknow Payments from J. Perry for some months. In short, Mr.

Beveridge's entire course of conduct is consistent with an intent to deceive and defraud

IBP.

As to the Lucknow Payments made prior to Mr. Beveridge's January 2003 representation, the court concludes those payments fall within the scope of section 523(a)(4). Those early payments fit the definition of embezzlement: they were made from funds of IBP that were entrusted to Mr. Beveridge and were fraudulently appropriated by him to his own benefit.

The initial $15,000 payment does not represent non-dischargeable debt because it was made before IBP owned Jerome Russell and Hay-Tec. Because IBP did not own or control the funds from which the first $15,000 payment was made, it was impossible for Mr. Beveridge to have made a misrepresentation or to have committed actual fraud as to IBP regarding that payment. While the $15,000 may have been improperly appropriated, the victim was Pro-Style, not IBP.

As to Mrs. Beveridge, there is no evidence that she ever made any representation to J. Perry (or anyone else) respecting the Lucknow Payments. The funds of IBP used to make the Lucknow Payments were not entrusted to her care. Her role at Jerome Russell was not the sort that gives rise to a fiduciary relationship within the meaning of Code § 523(a)(4).[55] Finally, there is no evidence of her participation in the transfer of funds to Lucknow; thus she did not willfully or maliciously cause injury to IBP.

### 5. Mustang

---

[55]   The court finds no basis to conclude Mrs. Beveridge was a fiduciary. The only basis for finding a fiduciary relationship between either of the Beveridges would be the role either filled in IBP's corporate structure. If either were an officer of director, that would be sufficient. *See e.g., Moreno*, 892 F.2d at 421 (holding that debts of corporate officer to a corporation were potentially non-dischargeable under section 523(a)(4)); *Bennett*, 989 F.2d at 787 (stating that officers and directors of a corporation are fiduciaries to that corporation for the purpose of section 523(a)(4)). Mrs. Beveridge clearly was neither an officer nor a director or IBP. It is unclear to the court whether Mr. Beveridge had a fiduciary relationship to IBP that would satisfy as a matter of law the requirements of Code § 523(a)(4). While he held the title of president and CEO, he was not, in fact, an officer or director of IBP – though his authority arguably was the same as if he were.

IBP claims that the Mustang Payments give rise to a non-dischargeable debt under Code §§ 523(a)(2)(A), (a)(4) and (a)(6). The court concludes that the Mustang Payments are non-dischargeable under section 523(a)(2)(A) as to Mr. Beveridge; the Mustang Payments are fully dischargeable as to Mrs. Beveridge. Because the Mustang Payments are non-dischargeable as to Mr. Beveridge under section 523(a)(2)(A), there is no need for the court to analyze their dischargeability as to him under section 523(a)(4) or (a)(6).

The Mustang Payments give rise to a non-dischargeable debt under section 523(a)(2)(A) because the Mustang Payments were obtained through Mr. Beveridge's false representations and actual fraud. Before J. Perry agreed that Mrs. Beveridge would continue working for Jerome Russell as an employee of IBP, Mr. Beveridge represented to him that Mrs. Beveridge was being paid a salary of $60,000 per year. He failed to mention that Mrs. Beveridge was also being paid commissions on trade show sales. It would have been difficult for J. Perry to learn that commissions were accruing for Mrs. Beveridge's trade show sales because the payments were to Mustang, rather than to her, and because neither of the Beveridges' names were listed as a contact for Mustang on the rep sheet containing contact information respecting commissioned sales reps.

The Mustang Payments are non-dischargeable for false representations because they meet the three part test as follows: (1) Mr. Beveridge omitted to inform J. Perry (IBP) that Mrs. Beveridge was being paid a commission (as stated above, a debtor's silence regarding a material fact is sufficient to make a debt non-dischargeable[56]); (2) Mr. Beveridge's representation, known to him to be untrue, of Mrs. Beveridge's salary described current facts that were relevant to J. Perry's decision to employ her; and (3) J.

---

[56]    Given how recent Mr. Beveridge's instructions were to pay commissions on SHOW05 sales, the court concludes that Mr. Beveridge was conscious of the omission.

Perry relied on Mr. Beveridge's description of Mrs. Beveridge's compensation when he decided to retain her services. Thus, the Mustang Payments are moneys obtained through Mr. Beveridge's false representation and are not dischargeable under section 523(a)(2)(A).

The Mustang Payments are also non-dischargeable because they are moneys obtained through Mr. Beveridge's actual fraud under Code § 523(a)(2)(A). Mr. Beveridge made representations to J. Perry (IBP) regarding Mrs. Beveridge's compensation, he knew the representations were false when he made them, J. Perry relied on Mr. Beveridge's representations, and IBP suffered losses as a result of J. Perry's reliance. The final element of actual fraud that must be addressed is whether Mr. Beveridge intended to deceive IBP when he described Mrs. Beveridge's salary.

The use of a shell corporation with a blind mail drop is consistent with fraudulent intent. The limited disclosure respecting Mustang on the rep sheet supports the court's determination that Mustang was a device meant to conceal the true beneficiary of the Mustang Payments. That some of IBP's employees were aware of the connection between Mustang and the Beveridges does not alter the court's conclusion, as Mr. Beveridge clearly made every effort to prevent contact between Jerome Russell employees and J. Perry.

Mrs. Beveridge, however, presents a different case. The record reflects only that she learned she was to begin receiving commissions in mid-2002. The decision to pay the commissions, which to her knowledge was within his authority, was made by Mr.

Beveridge, who was also responsible for selecting and fashioning the deceptive manner of paying the commissions.[57]

Although the commissions were payable for Mrs. Beveridge's work, they were funneled to Mustang, a corporation jointly owned by her and Mr. Beveridge. So far as may be gleaned from the record, Mustang was controlled by Mr. Beveridge, who also controlled Mustang's bank accounts. Thus, though the Mustang Payments were technically intended for Mrs. Beveridge, they were available to and used by Mr. Beveridge upon their receipt by Mustang.

In sum, Mrs. Beveridge made no representation that induced the Mustang Payments. Likewise she was not entrusted with the funds from which the payments were made and had no fiduciary role as to IBP. Finally, as Mrs. Beveridge did not cause the Mustang Payments to be made, she did not, through their payment, willfully or maliciously harm IBP.

### 6. Constructive Trust on the Grapevine Property

IBP asks that the court impose an equitable lien on the Grapevine Property, or that the court place it in a constructive trust for IBP's benefit. The court finds that the facts of the case support placing the Grapevine Property in a constructive trust to the extent of $305,492.18. Because the court is placing the Grapevine Property in a constructive trust, the issue of an equitable lien is mooted.[58]

---

[57]    Mrs. Beveridge evinced virtually total ignorance about, *inter alia*, the methods developed by Mr. Beveridge for realizing her commissions. The court is somewhat ambivalent about whether Mrs. Beveridge's testimony is credible, but the record before it does not provide evidence contradictory to her testimony such that it may be disregarded. The court thus concludes that IBP has not met its burden to show the elements required for a finding of non-dischargeability, as to Mrs. Beveridge, under section 523(a)(2)(A), (a)(4) or (a)(6).

[58]    Imposition of an equitable lien is not only mooted, but is also inappropriate for this case. In Texas imposition of an equitable lien requires, *inter alia,* that "the parties intended specific property to

The first of the requirements for imposition of a constructive trust is that the debtor committed actual fraud, or constructive fraud by abuse of a fiduciary or confidential relationship. Because the court finds that this requirement is satisfied through actual fraud, there is no need for the court to examine whether the Beveridges committed constructive fraud through abuse of a fiduciary or confidential relationship.[59]

The elements necessary to prove actual fraud under Texas law are parallel to those of actual fraud for the purposes of non-dischargeability of a debt under section 523(a)(2)(A). Therefore, the court concludes that, because Mr. Beveridge's actions, as described above in the court's discussion of the Lucknow Payments, constituted actual fraud under section 523(a)(2)(A), his actions are also sufficient to meet the fraud requirement necessary to impose a constructive trust.

The Beveridges would clearly be unjustly enriched if the court were not to place the Grapevine Property in a constructive trust because the Grapevine Property was purchased with money that Mr. Beveridge obtained from IBP through his actual fraud (or embezzlement). At trial Mr. Beveridge testified that the Lucknow Payments were the source of the down payment for the Grapevine Property. Because the court has already concluded that the Lucknow Payments constitute a non-dischargeable debt, allowing Mr.

---

secure payment of a debt." *In re Daves*, 770 F.2d 1363, 1367 (5th Cir. 1985). In the case at bar neither of the parties ever intended for any of the Beveridges' assets to secure a debt. In fact, the very existence of a debt was a matter of dispute.

[59]    However, while it is arguable that Mr. Beveridge was not in a fiduciary relationship with IBP, there can be no question that his position *vis-à-vis* IBP was one of confidence, and the court so finds. To the extent that the earlier payments were obtained by Mr. Beveridge through embezzlement rather than actual fraud, the court concludes embezzlement also satisfies the first prong of the test for a constructive trust, but also amounts to constructive fraud by breach of a confidential relationship between Mr. Beveridge and IBP.

Beveridge to have the benefit of the Lucknow Payments through unfettered ownership of the Grapevine Property would unjustly enrich Mr. Beveridge.

The money used to acquire the Grapevine Property is attributable to Mr. Beveridge's actual fraud because, at trial, he admitted that the Lucknow Payments were the direct source of the down payment for the Grapevine Property. Between the first Lucknow Payment in August of 2002 and the Beveridges' purchase of the Grapevine Property in August of 2004, and including interest, the Lucknow Payments totaled $308,059.36. *See* PX53. Lucknow's bank statements show that $308,000 (less transaction fees) was transferred from one of Lucknow's bank accounts to Marksman's bank account. *See* PX59. Lucknow had $310,287.79 in its bank account before the transfer to Marksman, and $2,287.79 was left in the account after the transfer. After the money was transferred to Marksman it was transferred to Allegiance. *See* PX57. Then, $307,480 of the money that Allegiance was holding was used to help fund the purchase of the Grapevine Property. *See* PX68.

While it is true that the Lucknow bank account from which the down payment for the Grapevine Property was transferred was not solely funded through the Lucknow Payments, the court can still trace the down payment for the Grapevine Property directly to the Lucknow Payments by using the lowest intermediate balance test. The lowest intermediate balance of the Lucknow bank account, before money derived from the Lucknow Payments was withdrawn for the purpose of a down payment on the Grapevine Property, was $310,287.79. A small portion of this $310,287.79 was not funded from through the Lucknow Payments. Because the lowest intermediate balance test creates a legal fiction that non-trust funds are withdrawn from a trust account first, only a small

part of the $308,000 transfer consisted of non-trust funds. Of the $308,000 transfer,

$2,507.82 were funds that were not derived from the Lucknow Payments; therefore

$305,492.18 of the down payment was funded through the Lucknow Payments. The

balance ($2,287.79) that remained in Lucknow's bank account after the transfer of the

down payment was money that was attributable to the Lucknow Payments.

IBP also seeks an injunction preventing the Beveridges from transferring the

Grapevine Property. The court concludes that an injunction is unnecessary because the

court imposes a constructive trust on the house. Once final judgment is entered, IBP may

record the judgment in the real property records, thereby protecting its interest in the

house. An injunction could probably not even serve to bridge the brief time between

issuance of this memorandum opinion and IBP's recordation of the final judgment in the

case, since a similar gap would intervene before the injunction could take hold.

### 7. Constructive Trust on the Vanden Plas

IBP asks that the Vanden Plas be placed in a constructive trust or be subject to an

equitable lien because the funds used for the car's down payment and some of the

payments were made from the Mustang's bank account. The court finds that the Vanden

Plas should be subject to a constructive trust for IBP's benefit to the extent of $5,000.

Because the court is placing the Vanden Plas in a constructive trust the necessity of an

equitable lien is mooted.

The first element required under Texas law for the court to impose a constructive

trust is that the debtor committed actual fraud, or constructive fraud through abuse of a

special or fiduciary relationship. Because the court found that the Mustang Payments are

non-dischargeable under section 523(a)(2)(A) as a result of Mr. Beveridge's actual fraud, there are also sufficient grounds to impose a constructive trust under Texas law.

The next element required for imposition of a constructive trust is that the debtor would be unjustly enriched by being allowed to keep the property. The Beveridges would be unjustly enriched if they were allowed to keep the Vanden Plas for the same reasons they would be unjustly enriched if allowed to keep the Grapevine Property free of any interest of IBP.

Finally, imposition of a constructive trust requires a traceable res upon which to impose the trust. As far as the court can tell, there is no evidence in the record showing that Mustang's bank account was funded through any deposits other than those derived from the Mustang Payments. The evidence shows that a check for $5,000 was written to Texascarsdirect.com from Mustang's bank account. PX32. At trial Mrs. Beveridge testified that this check represented the down payment on the Vanden Plas. These facts sufficiently establish that $5,000 of the Vanden Plas's purchase price was funded through money the Beveridges acquired from the Mustang Payments (the court cannot identify similar evidence of other payments from the Mustang account, however; thus the trust is limited to $5,000).

### 8. Exemptions

IBP has objected to several of the Beveridges' claimed exemptions including exemptions for the Grapevine Property, the Vanden Plas, the Insurance Policy and the Personal Items (the "Exemptions"). IBP's objections to the Exemptions are based on the source of funds used to purchase the items listed as the Exemptions. With few exceptions, principally sections 522(o) and (p), the Code does not provide for denial of an exemption

based on the source of funds used to purchase the exempted property.[60] The Code only

tests exemptions based upon whether the property claimed falls within a statutorily

specified category; an exemption will be denied if it is for property not allowable under

the debtor's chosen statutory scheme, federal or state. The Beveridges elected to take

their state exemptions. The items claimed as exempt and subject to IBP's challenge fall

within the permitted categories. Even if the court were to examine the source of the funds

used to purchase the items claimed under the Exemptions, it would be impossible for the

court to determine, from the record before it, whether any individual item had been

purchased with non-exempt funds derived from the Lucknow Payments or Mustang

Payments. Hence, to the extent owned by the Beveridges, their claim of exemption of

those items must be sustained.

      IBP has claimed that the Beveridges' exemption for the Grapevine Property

should be denied under section 522(o). Denial of the exemption for the Grapevine

Property under section 522(o) is inappropriate in this case because section 522(o) was

intended to address exemption of a homestead where there had occurred the "debtor's

accumulation of equity in his homestead by liquidating non-exempt property and

applying the proceeds to the homestead." *In re Anderson*, 374 B.R. 848, 857 (Bankr. D.

Kan. 2007) (reversed on other grounds). One of the elements that must be shown to

prevail under section 522(o) is that the debtor disposed of non-exempt property to invest

the proceeds in exempt property. *In re Fehmel*, 2008 Bankr. LEXIS 2577, *15 (Bankr.

W.D. Tex. 2008). In this case the record does not reflect that the Beveridges liquidated

any nonexempt property, other than the Lucknow bank account, which the court has

---

[60]    As the court does in the case at bar, the conversion of another's funds into a debtor's exempt
property may be addressed through, *inter alia,* imposition of a constructive trust.

addressed through a constructive trust, for the purpose of building equity in the Grapevine Property. Consequentially, the Grapevine Property was properly claimed as exempt, though the property must be subject to the constructive trust for IBP.

**9. Attorney's Fees and Interest**

IBP has requested that it be awarded attorney's fees, costs, and pre and post-judgment interest. IBP's request for attorney's fees is denied. Court costs shall be assessed against the Beveridges. Pre-judgment interest is denied. Under 28 U.S.C. § 1961 interest is to be allowed on money judgments in civil cases recovered in district courts. Therefore, IBP is entitled receive post-judgment interest in compliance with 28 U.S.C. § 1961.

## III. Conclusion

For the reasons stated above, IBP shall have judgment against Mr. Beveridge in the amount of $554,556.10, which judgment, representing the Lucknow Payments totaling $354,513 and the Mustang Payments totaling $200,043.10, shall not be discharged pursuant to Code § 523. All debts owed to IBP shall be discharged as to Mrs. Beveridge. IBP shall have judgment that the Grapevine Property is subject to a constructive trust to the extent of $305,492.18 and the Vanden Plas is subject to a constructive trust to the extent of $5,000 for the benefit of IBP.

IBP may pursue such remedies as may be available to it to realize on its ownership interest in the Grapevine Property and the Vanden Plas. Any proceeds realized by IBP from the Grapevine Property or the Vanden Plas shall, dollar-for-dollar, reduce the non-dischargeable debt owed by Mr. Beveridge. IBP shall further have judgment that the Insurance Policy is not the property of the Beveridges. The money judgment shall

bear interest from date of entry at the rate provided by the Director of the Administrative Office of the United States Courts.

IBP's counsel is instructed to submit a judgment reflecting the foregoing within 10 days of issuance of this opinion. Simultaneously with submission of the judgment it shall be served upon counsel for the Beveridges. The Beveridges may provide to the court any comments on the proposed judgment within three business days after their receipt of it.

#### END OF MEMORANDUM OPINION ####